IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| **EDDIE CARDONA,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil No. **07-503-JPG-CJP** |
| | ) | |
| **S. PICKETT, DR. DOWDY[1], and** | ) | |
| **P/A RATAAN[2],** | ) | |
| | ) | |
| Defendants. | ) | |

## REPORT and RECOMMENDATION

This Report and Recommendation is respectfully submitted to District Judge J. Phil Gilbert pursuant to 28 U.S.C. §§636(b)(1)(B) and (C).

Before the court is Defendants' Motion for Summary Judgment. **(Doc. 27)**.  The motion is filed on behalf of the three remaining defendants, Joel S. Pickett, Dr. Thomas Dawdy (incorrectly named by plaintiff as Dr. "Dowdy"), and Physician's Assistant Satinder Rattan (incorrectly named  by plaintiff as "Rataan").  Defendants filed a Memorandum in Support **(Doc. 28)**, which is accompanied by exhibits, including the affidavits of defendants and portions of plaintiff's medical records.

Defendant served upon the pro se plaintiff the notice required by ***Lewis v. Faulkner*, 689 F.2d 100, 102 (7th Cir. 1982)**.  **(Doc. 29)**.  Plaintiff filed a Response, to which he attached various exhibits.  **(Doc. 30)**.  These exhibits include his own affidavit and additional copies of some of defendants' exhibits.  Defendants filed a reply.  **(Doc. 31)**.  Plaintiff then filed a sur-

---

[1]The correct spelling of this defendant's name is "Dawdy."  See, Doc. 28, footnote 1.

[2]The correct spelling of this defendant's name is "Rattan."  See, Doc. 28, p. 8; Doc. 28, Ex. 2.

reply at **Doc. 32.**  Pursuant to Rule 7.1(c) of the this District's Local Rules, " Under no circumstances will sur-reply briefs be accepted."  Therefore, this Court has not considered the arguments raised in plaintiff's sur-reply brief.

The Court notes that, in **Doc. 30**, plaintiff suggests that the proceedings be stayed until defendants respond to his requests for admissions.  However, plaintiff has not filed a motion to compel responses to his discovery requests.  The Court has reviewed his requests for admissions, and the matters stated therein are either not dispositive or directly refuted by the record. Therefore, there is no adequate reason to delay ruling on defendants' motion.

### Nature of Plaintiff's Claims

Plaintiff Eddie Cardona was an inmate in the custody of the Bureau of Prisons at all times relevant to this lawsuit.[3]  He sued pursuant to ***Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971)**, alleging that his Eighth Amendment rights were violated by defendants' deliberate indifference to his serious medical needs while he was assigned to FCI-Greenville.

Plaintiff has Type II diabetes.  According to his complaint, before he was transferred to Greenville in May, 2005, he was incarcerated at MCC-Chicago and FMC-Devens. He alleges that he was treated with insulin at MCC-Chicago, but that, upon his arrival at Greenville, Dr. Dawdy discontinued the insulin.  Plaintiff complains about the management of his diabetes at Greenville, which, according to him, caused him to suffer a loss of vision in his eye.

### Grounds for Summary Judgment

Defendant Joel Pickett was the Health Services Administrator at Greenville.  He argues that he did not have any personal involvement in the decisions regarding Cardona's medical care.

---

[3]Cardona has recently been released from prison.  See, Doc. 33.

Defendant Rattan was a physician's assistant.  He likewise argues that he had no personal involvement in the treatment decisions complained of, in that he only saw plaintiff one time for a physical shortly after his arrival at Greenville.

Lastly, Dr. Dawdy argues that the record establishes that he was not indifferent to plaintiff's medical needs.  On the contrary, he saw and treated plaintiff on a regular basis. Defendant argues that, at most, the record establishes that Cardona disagrees with Dr. Dawdy as to the best course of treatment.

### Standard for Summary Judgment

Summary judgment is appropriate under **Fed.R.Civ.P. 56** where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  **Fed.R.Civ.P. 56(c);  see *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552 (1986).**  The evidence is construed in the light most favorable to the non-moving party and all justifiable inferences are drawn in favor of that party. **See, *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 255, 106 S.Ct. 2505, 2513-14 (1986).** Once the moving party has produced evidence to show that he or she is entitled to summary judgment, the non-moving party must affirmatively demonstrate that a genuine issue of material fact remains for trial.  ***Johnson v. City of Fort Wayne*, 91 F.3d 922, 931 (7th Cir. 1996).**

In responding to a summary judgment motion, the non-moving party may not simply reiterate the allegations contained in the pleadings; more substantial evidence must be presented at this stage.  Moreover, a genuine issue of material fact is not shown by the mere existence of "some alleged factual dispute between the parties," ***Anderson*, 477 U.S. at 247**, or by "some metaphysical doubt as to the material facts," ***Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586 (1986).**  Rather, a genuine issue of material fact exists only if "a fair-minded

jury could return a verdict for the [nonmoving party] on the evidence presented." ***Anderson*, 477 U.S. at 252, 106 S.Ct. at 2512.**

Summary judgment is not barred by the mere existence of some factual dispute. ***Anderson*, 477 U.S. at 248; see also, *JPM Inc. v. John Deere Industrial Equipment Company*, 94 F.3d 270, 273 (7th Cir. 1996).** Only disputes as to facts that might affect the outcome of the suit in light of the substantive law are sufficient to defeat summary judgment. Disputes as to irrelevant or unnecessary facts do not preclude summary judgment. ***Clifton v. Schafer*, 969 F.2d 278, 281 (7th Cir. 1992).**

Plaintiff is a *pro se* inmate, and his pleadings must be liberally construed. ***Duncan v. Duckworth*, 644 F.2d 653, 655 (7th Cir. 1981).**

<u>**Analysis**</u>

In order to prevail on his constitutional claim, plaintiff must satisfy the two-part test enunciated in ***Farmer v. Brennan*, 511 U.S. 825, 834, 114 S.Ct. 1970 (1994)**. This test has an objective *and* a subjective component. That is, plaintiff must show that (1) his condition was objectively serious, *and* (2) the defendant acted with deliberate indifference, which is a subjective standard. ***Reed v. McBride*, 178 F. 3d 849, 852 (7th Cir. 1999).** "With respect to the culpable state of mind, negligence or even gross negligence is not enough; the conduct must be reckless in the criminal sense." ***Lee v. Young*, 533 F.3d 505, 509 (7th Cir. 2008)**.

Liability under 42 U.S.C. §1983 and for purposes of ***Bivens, supra***, is personal; there is no liability unless the defendant "caused or participated" in the deprivation of a constitutional right. ***Vance v. Peters*, 97 F.3d 987, 991 (7th Cir. 1996)**. Thus, the two-prong ***Farmer*** test must be satisfied separately as to each defendant.

The Eighth Amendment prohibits cruel and unusual punishment. It does not, however, entitle a prison inmate to "unqualified access to healthcare" or to the best care possible. Prison

4

inmates are entitled only to "adequate medical care." ***Johnson v. Doughty***, **433 F.3d 1001, 1013 (7th Cir. 2006)**. It is proper to consider the "cost of treatment alternatives" in "determining what constitutes adequate, minimum-level medical care." ***Id.*** See also, ***Maggert v. Hanks***, **131 F.3d 670, 671-672 (7th Cir. 1997)**(Prisoner "is entitled only to minimum care.").

**1.**      <u>**Plaintiff's Medical Condition and Treatment**</u>

Cardona arrived at FCI-Greenville on May 10, 2005. The record contradicts plaintiff's allegation that he was on insulin at the time of his transfer to Greenville. In fact, according to Dr. Dawdy's review of the medical records, he was on insulin at MCC Chicago only from April 30, 2004, to June 9, 2004. Thus, insulin was discontinued almost a year before he was transferred to Greenville. Cardona was changed from insulin to oral medication while still at Chicago because he only took the insulin one to two times a week instead of every day, as he was supposed to, and because his blood sugars were well-controlled despite the fact that he did not take the insulin as directed. All of his medications were continued upon his arrival at Greenville. Doc. 28, Ex. 3, ¶21.

In his affidavit, Dr. Dawdy explains that plaintiff has Type II Diabetes. Doc. 28, Ex. 3, ¶3. Type II diabetes is not treated with insulin unless it is uncontrolled. Dr. Dawdy states "Insulin is typically used to treat Type I Diabetes or uncontrolled Type II diabetes. Controlled Type II Diabetes is often treated with a combination of oral medications, including Metformin or Glyburide (both of which Cardona was on.)" Doc. 28, Ex. 3, ¶21.

The medical records confirm that, when he was transferred from MCC Chicago in May, 2005, plaintiff was taking Metformin and Glyburide, in addition to other medications, and he was not taking insulin. Doc. 28, Ex. 4, p. 2. ¶21.

5

When plaintiff arrived at Greenville on May 10, 2005, he was examined by a physician's assistant named Cesar Lopez, who is not a defendant.  Lopez continued his medications and recommended that he be placed in the Chronic Care Clinic ("CCC").  Doc. 28, Ex. 3, ¶3;  Doc. 28, Ex. 4, p.4.  Inmates with ongoing medical needs are assigned to medical management via Chronic Care Clinics, whereby they are seen at least every six months, and more often if clinically indicated.  Doc. 28, Ex. 3, footnote 1.

On May 18, 2005, defendant Rattan, also a physician's assistant, examined plaintiff.  He ordered lab work in preparation for the CCC.  Doc. 28, Ex. 4, p.5.  That is the only date on which the medical records document a visit with Rattan.

Dr. Dawdy saw plaintiff in the CCC on June 7, 2005.  Plaintiff's glycated hemoglobin test was at "an acceptable level of 6.4."  Doc. 28, Ex. 3, ¶5.  All of plaintiff's medications were continued, and Dr. Dawdy directed that he be seen by a dietician and by the eye clinic.  Dr. Dawdy also encouraged plaintiff to have a finger-stick glucose test weekly.  *Ibid*.

With regard to the checking of blood sugar levels, Dr. Dawdy explains in his affidavit that the glycated hemoglobin test, which was administered to plaintiff at his regular Chronic Care Clinic visits, is "critical in patients with Type II diabetes."  Doc. 28, Ex. 3, footnote 2.  This test shows the mean glycemia level for the past two to three months.  The glycated hemoglobin test is "more instructive" than a finger-stick test, which plaintiff claims he should have been given daily.  The finger-stick test shows only "a snapshot of the glucose level at the time of the test."  *Ibid.*  Diabetes is under good control when the glycated hemoglobin test result is at 7 or less.  *Ibid.*

In addition to the periodic glycated hemoglobin tests, plaintiff could have had weekly finger-stick glucose testing by appearing for the pill line at the Health Services Unit on

Wednesday mornings.  The finger-stick test is useful for the patient to self-moniter his blood sugars.  Doc. 28, Ex. 3, ¶5 and footnote 3.

Cardona was seen in the CCC in October, 2005, and January, 2006.  On both dates, his glucose was high.  On the January 5, 2006, visit his glycated hemoglobin test was 7.9.  He reported no problems with his eyes. Dr. Dawdy states that it was "clear that Cardona did not have good control of his diabetes."  Plaintiff admitted that he had not been taking his medication as prescribed.  Dr. Dowdy addressed this situation by counseling plaintiff to take his medication as prescribed, discussing dietary management, and strongly encouraging plaintiff to get the weekly finger-stick blood tests.  Doc. 28, Ex. 3, ¶¶ 9 & 13.

Blood work drawn on March 1, 2006, showed a glycated hemoglobin test of  7.9 and glucose at 198.  His cholesterol was still high as well.  Dr. Dawdy scheduled an early appointment for March 10, 2006, which was rescheduled for March 14, 2006, when plaintiff missed the first appointment.  Doc. 28, Ex. 3, ¶ 14.

On March 14, 2006, Cardona made no complaints about his vision.  He admitted to eating too much chocolate and meat lately.  Further, he admitted he had not been taking his Gemfibrozil (for high cholesterol) as ordered.  Dr. Dawdy discontinued the Gemfibrozil, increased Simvastatin (for high cholesterol) and Glyburide (for diabetes).  His other diabetes medication, Metformin, was continued, as were Lisinopril (for hypertension), aspirin (blood thinner) and Amitriptyline (for burning sensation in feet).  Dr. Dawdy ordered labwork to be performed around April 14, 2006, and scheduled his next CCC visit for around May 14, 2006. Doc. 28, Ex. 3, ¶15; Ex. 4, pp. 15-16.

According to Dr. Dawdy's affidavit, the first indication of an eye or vision problem came on March 21, 2006, when plaintiff indicated to staff members that his vision was blurred.  Doc.

28, Ex. 3, ¶16.  Prior to that time, the optometrist's consultation notes indicated Cardona had no

retinopathy and no particular complaints.  Ex. 6, p. 14.  He appeared for sick call with a

complaint of loss of vision in his right eye on March 27, 2006, and was seen in the eye clinic on

the next day.  The optometrist opined that he may have suffered a Central Retinal Vein

Occlusion in his right eye, and recommended a consultation with a retinologist.  Ex. 6, p. 17.  Dr.

Dawdy's notes state that the optometrist told him that "the retinology visit was not emergent."

Doc. 28, Ex. 3, ¶16; Ex. 4, p. 17.  The request for an outside retinology consult was approved the

next day.  Ex. 4, p. 17.

   The retinologist, Thomas Fleming, M.D., saw plaintiff on April 5, 2006.  He diagnosed a

Branch Retinal Vein Occlusion ("BRVO") in the right eye, as well as mild background diabetic

retinopathy of the left eye.  According to Dr. Dawdy's affidavit, a BRVO is a "blockage (blood

clot) in one of the small blood vessels that drains blood from the retina.  A BRVO results in

partial loss of vision."  Ex. 3, ¶ 17.  Dr. Fleming injected a steroid to decrease swelling and

chance of infection, and asked to see him again in two weeks.  Ex. 6, pp. 17-18.

   Plaintiff was treated by the outside retinologist on eleven more visits from April 16,

2006, through September 5, 2007.  Dr. Fleming performed laser surgery to prevent leaking.

There was, however, no treatment that could fully restore his eyesight.   Ex. 3, ¶ 18.

   In July, 2006, Dr. Dawdy put plaintiff on insulin in addition to oral medications to try to

get better control of his blood sugars.  Ex. 3, ¶ 21.  While he did have some improvement, he still

continued to have episodes of high blood sugar even while taking insulin.  On September 1,

2006, his hemoglobin test had improved to 6.8 and he indicated he was taking his medications as

prescribed.  However, his cholesterol was still high.  Ex. 5, p. 6.  On November 13, 2006, his

diabetes was noted to be "uncontrolled."  Ex. 5, p. 10.  On January 11, 2007, Dr. Dawdy noted

that his evening blood sugars were running high, probably due to his habit of eating a sandwich in the afternoon.  His hemoglobin test result was 7.9.  Ex. 5, p. 15.  On April 2, 2007, his hemoglobin test result was high at 8.6, and his afternoon blood sugars were in the mid 200's. It was noted that he was not taking his medication correctly.  (Ex. 5, p. 18).  By June 21, 2007, he was still on both insulin and oral medications, and was seeing some improvement in his blood sugar control.  Ex. 5, p. 23.

In his affidavit, Dr. Dawdy states that "The BRVO could have occurred if Cardona did not have diabetes.  It could have occurred if Cardona's diabetes was controlled.  A person is at a higher risk for blood vessel disease if they are hypertensive or diabetic.  A person is at an even higher risk if the diabetes is not controlled.  Here, Cardona was receiving aspirin (serving as a blood thinner) to prevent a blood clot."  Doc. 28, Ex. 3, ¶19.  He further states that "There was no prior indication that Cardona would suffer a BRVO and there was nothing further that could have been done to prevent it from occurring.  As soon as he complained of blurriness, he was sent to the eye clinic."  *Ibid.*  Dr. Dawdy also states that "His treatment for diabetes was made more difficult by Cardona's lack of cooperation."  *Ibid.*

## 2.    **Defendant Joel S. Pickett**

Defendant Pickett argues that he is entitled to summary judgment because, as Health Services Administrator, he did not render medical treatment to plaintiff or make treatment decisions.

Personal involvement is required for a defendant to be liable for a Constitutional violation.  ***Johnson v. Snyder*, 444 F.3d 579, 583 (7th Cir. 2006)**.

Pickett's affidavit is attached to Doc. 28 as Exhibit 1.  At the relevant time,  Pickett was the Health Services Administrator at FCI-Greenville.  Ex. 1, ¶1.  Pickett has a Masters Degree in

Sports Medicine, but does not have privileges to practice medicine at Greenville.  Ex. 1, ¶4.

Further, his job functions do not include making clinical decisions.  *Ibid.*

Pickett's job functions and responsibilities are described in the second paragraph of his

affidavit.  Those functions and responsibilities are administrative rather than clinical.  He was

responsible for "the planning and implementation of the administrative aspects of the health

services department (including supervision of administrative personnel, procurement, supply,

Drug-free Workplace Program, housekeeping, sanitation, and maintenance)."  He supervised

mid-level practitioners for administrative issues, but not for clinical aspects.

At paragraph 9, Pickett states that he was "never responsible" for ordering blood sugar

testing, implementing a blood sugar testing program, or prescribing medications for plaintiff.

While Pickett did have some contact with plaintiff regarding his complaints and medical

treatment, his role was limited to encouraging Cardona to go to the sick call line so he could be

seen by health care providers, or forwarding Cardona's written requests to the appropriate

person. Ex. 1, ¶¶6, 7, 8.  Lastly, Pickett states that the budget for the medical department was his

responsibility, and that he never recommended or ordered that any treatment be denied or limited

due to budget concerns.

The motion should be granted as to defendant Pickett.  The Seventh Circuit has held that

a health care unit administrator did not have personal involvement sufficient for liability where

he  investigated the situation surrounding an inmate's medical treatment in response to

complaints by the inmate, referred the inmate to a doctor, and reasonably relied on the doctor's

opinion. ***Johnson v. Doughty*, 433 F.3d 1001, 1015 (7th Cir. 2006)**.  Prison employees who are

not health care providers are entitled to summary judgment where they "reasonably relied" on

the fact that the inmate was being seen by the medical staff. ***Johnson*, 433 F.3d at 1011.**

"Except in the unusual case where it would be evident to a layperson that a prisoner is receiving inadequate or inappropriate treatment, prison officials may reasonably rely on the judgment of medical professionals." *Johnson*, 433 F.3d at 1011 (internal citation omitted.)  See also, *Lee v. Young*, 533 F.3d 505, 511 (7th Cir 2008).

The facts regarding Pickett's liability are similar to the facts in *Johnson*.  Plaintiff's medical situation was being addressed by the health care providers.  Pickett is not a health care provider, did not have privileges to practice medicine, and did not have the authority to make clinical decisions.  Plaintiff admits in his own affidavit that Pickett told him to "keep going to sick call and complain that my diabetes was not being controlled." Doc. 30. Ex. C, ¶7.

Plaintiff suggests in his response, Doc. 30, that Pickett had personal involvement because he knew that plaintiff's blood sugars were too high but failed to interfere with the treatment plaintiff was receiving.  He is incorrect.  Where, as here, it was not Pickett's function or responsibility to make clinical decisions, he cannot be liable for failing to interfere in the treatment decisions made by the medical staff.  "Bureaucracies divide tasks; no prisoner is entitled to insist that one employee do another's job." *Burks v. Raemisch*, 555 F.3d 592, 595 (7th Cir. 2009).

### 3.    Defendant Satinder Rattan

Rattan's affidavit is attached to Doc. 28 as Ex. 2.  His affidavit states that he is a physician's assistant and that he performed the intake physical on Cardona on May 18, 2005.  He had no further personal contact with Cardona until February, 2007, which was after the BRVO had occurred and after plaintiff had been placed back on insulin.

It is clear that Rattan lacks personal involvement in the events of which plaintiff complains.  In his response, plaintiff suggests that Rattan checked his blood sugar on unspecified

dates, and told him that his levels were okay when they really were not.  Doc. 30, Ex. C, ¶10.

These vague allegations are contradicted by the medical records attached to Doc. 28.  They are

also contradicted by plaintiff's claim that he made repeated complaints to defendants that his

blood sugars were too high.  Doc. 30, Ex. C, ¶¶ 6, 11.  Plaintiff has not come forward with any

evidence to support his claims.  Conclusory allegations such as these are not sufficient to defeat

summary judgment.  ***First Commodity Traders v. Heinold Commodities***, **766 F.2d 1007, 1011**

**(7th Cir. 1985).**

**4.**      **Thomas Dawdy, M.D.**

      Dr. Dawdy argues, correctly, that the record established only that plaintiff and he have a

disagreement about the proper course of treatment.  This difference of opinion does not rise to

the level of a constitutional violation.  "[T]he Constitution is not a medical code that mandates

specific medical treatment."  ***Snipes v. DeTella***,  **95 F.3d 586, 592 (7th Cir. 1996)**.

      Even if plaintiff could demonstrate that Dr. Dawdy was wrong in his treatment

recommendations, he would not make a case.  Medical malpractice does not violate the

Constitution.  **See *Estelle*, 97 S. Ct. at 292; *Perkins v. Lawson*, 312 F.3d 872, 875 (7th Cir.**

**2002) (stating that even gross negligence does  not constitute deliberate indifference)**.  In

evaluating a claim of deliberate indifference, the court does <u>not</u> evaluate the defendant's conduct

in light of what a "reasonable doctor" would have done.  ***Walker v. Peters***, **233 F.3d 494, 499**

**(7th Cir. 2000).**   As the Seventh Circuit has stated, "A doctor might be careless in not

appreciating the need to investigate several possible explanations for a particular prisoner's

symptoms, and this carelessness may constitute malpractice. But malpractice alone is not enough

to meet the constitutional standard."   ***Id***.

      The record establishes that Dr. Dawdy was not deliberately indifferent to the need to

manage Cardona's diabetes.  On the contrary, the medical records establish that Dr. Dawdy saw plaintiff on a regular basis, ordered regular labwork to monitor his condition, and adjusted his medications in an effort to control his diabetes.  In June, 2005, plaintiff's glycated hemoglobin test was at an acceptable level.  It is clear that Dr. Dawdy did not ignore the fact that plaintiff's glucose levels began to rise thereafter.  He adjusted plaintiff's medications and repeatedly counseled plaintiff regarding the need to take his medication as ordered and to adhere to the proper diet.  Dr. Dawdy determined that it was appropriate to try to control Cardona's diabetes through oral medication rather than insulin.  This is a medical decision.  A "deliberate decision by a doctor to treat a medical need in a particular manner" is not deliberate indifference.  ***Snipes v. DeTella***, **95 F.3d 586, 591 (7th Cir. 1996).**

Further, Cardona's theory of liability is premised on two points which are not supported by the record.  The first point is that the administration of insulin would have lowered his blood sugars.  However, the medical records establish that insulin is not a "silver bullet" for Cardona.  His blood sugars continued to be high even after he was prescribed insulin in July, 2006.

The second point is that the BRVO was caused by his high blood sugars.  This is contradicted by Dr. Dawdy's affidavit wherein he states that the "BRVO could have occurred if Cardona did not have diabetes.  It could have occurred if Cardona's diabetes was controlled."  Doc. 28, Ex. 3, ¶19.  The only "evidence" offered by plaintiff to refute this is his own affidavit in which he states that Dr. Fleming told him that the BRVO was caused by his high blood sugars.  However, this is an inadmissible hearsay statement, and it is not sufficient to defeat summary judgment.  Rule 56(e).

Lastly, the Court notes that plaintiff claims that Dr. Dawdy told him that he would not prescribe insulin because of the cost.  Dr. Dawdy denies making such a statement.  However,

even if Dr. Dawdy had considered the relative costs of treatment alternatives, that fact alone does not show that he was deliberately indifferent.  The Constitution guarantees prison inmates access to only "adequate medical care," and it is proper to consider the "cost of treatment alternatives" in "determining what constitutes adequate, minimum-level medical care."  ***Johnson v. Doughty***, **433 F.3d 1001, 1013 (7th Cir. 2006)**.

## Recommendation

This Court recommends that Defendants' Motion for Summary Judgment **(Doc. 27)** be **GRANTED** as to  the three remaining defendants, Joel S. Pickett, Dr. Thomas Dawdy (incorrectly named by plaintiff as Dr. "Dowdy), and Satinder Rattan (incorrectly named by plaintiff as "Rataan").

If this recommendation is adopted in its entirety, no claims will remain pending.

Objections to this Report and Recommendation must be filed on or before **February 16, 2010.**

**Submitted: January 28, 2010.**


**s/ Clifford J. Proud**
**CLIFFORD J. PROUD**
**UNITED STATES MAGISTRATE JUDGE**

14